Good morning, Your Honors. My name is Stephen Cowley. I'm here on behalf of the Appellant's Fraud and Telecommunications Group and Roderick Marshall. I would like to ask the panel to reserve two minutes for a brief rebuttal, if necessary, at the end. The appellant's case, the appellant's claims, on which we're here today, essentially arise out of a fraudulent scheme, and they charge fraud, the commission of fraud, in California as part of that scheme. That was based on a conspiracy between two individuals, principally, and their organizations. The individuals are Robert Wood, a member of a number of Deloitte entities, and I will return to that issue because that's one of the issues on which we're here, and George Manis. George Manis is a California resident. He has a couple of Vancouver entities. The scheme that these individuals ran was to get investors in what was pitched as a Bulgarian cable venture to acquire two Bulgarian companies, cable companies, roll them together, and flip them, pursuant to an already existing contract to flip them for a much higher price than they would be purchased, to other outside investors. The key, as it was pitched to Mr. Marshall, was that they needed cash on hand, on the ground, for an entity to buy and roll up these companies in Bulgaria to make the flip happen, that Mr. Wood and his partners at Deloitte had run into some trouble delivering that investor for Manis and had to deliver another one, and Marshall was the guy. He can make a lot of money here. Wood asked you a question. You have in the complaint the allegation that at one point, and perhaps several points, Wood said you've saved Deloitte, Slovakia. Now, does that appear also as a declaration by Marshall somewhere in the record? I'm sorry. You saved Deloitte. Besides the allegation, is there some factual declaration that repeats that statement? I guess I have to be perfectly honest. It's not coming to me quickly exactly what the statement. It's quite a dramatic statement. That you saved Deloitte. You saved Deloitte, Slovakia. That's an allegation in your complaint. And I can't recall if one of those is in – if that specific statement is in one of those two declarations, as opposed to the statement that we need you to come in and invest because we lost the investor by – the statement was that someone within Deloitte had been caught trying to bribe somebody who was going to be the investor. That investor had to back out because of his contacts with state officials. That's in Marshall's declaration? That is. Why he was necessary. I believe it was in the first. It may have also been in the second. There was a number of motions below as to which there was at least two declarations in the record submitted by Mr. Marshall. There's also the amended complaint and the allegations, many of which are simply not challenged in terms of the factual dispute. And, frankly, the allegations in the amended complaint based on the standard at which you're here cannot be challenged. One of the principal reasons we're here and sort of tying together most of the arguments as to Mr. Wood and the Deloitte defendants is that Deloitte simply misapplied the standard and made factual findings, rejected factual allegations of the plaintiff when it simply was not able to under the law. To briefly touch on the mainest situation, because I would like to focus more on the Wood and Deloitte situation with the limited time we have today, the court dismissed the claims against Mr. Manus individually, holding that those claims were subject to an arbitration clause. Very briefly, Your Honors, the way Wood was going to – the way, excuse me, Marshall was going to save everybody, as you point out, Wood, saying you needed an investor here to deliver to Manus. Well, what was going to be done is someone had to partner with Manus, because Manus was the guy with the contract to flip these Bulgarian companies. But someone had to get him the cash to buy them, put the companies into his vehicle to flip. Marshall was going to be the guy. He didn't know Manus. He knew Wood. Wood was the guy. He was bringing them together. And in order to make this happen, to get him his money back, Marshall was going to have to rely on Manus delivering at the end. When he flipped, he was going to get his money from his connecting with Manus. And the way they connected was they had a partnership agreement. Marshall formed a company to invest. Boston Telecommunications Group put the money in. Manus had his company's GCS and had a subsidiary that had the contract, and that's who they were going to have a partnership agreement with. Other principals in GCS and GSTS are the two acronyms, but the GCS companies is easier to refer to. Another individual that was a principal in the company signed the partnership agreement. That partnership agreement had a specific arbitration clause for disputes about the interpretation of the agreement itself and operations, essentially, a dispute about the operations of the partnership and the performance of the partnership. We said it doesn't fall under, but in any event, he's not the signatory. He's not a, quote, unquote, party to the contract that gets the benefit of the arbitration clause and specifically cannot because the parties in the agreement excluded third-party beneficiaries. So in agreeing to arbitrate, they said we only agree to arbitrate our disputes with each other, these specific disputes, and with nobody else. And yet the court said Manus, a third-party beneficiary of this, gets to claim arbitration for allegations of personal fraud against Manus, not for allegations of then failing to operate the partnership as agreed. This, what he's being sued for, was participating in a conspiracy to hook Mr. Marshall into the investment in the first place, not how the partnership operated. The fact that Mr. Marshall and his company might have arbitrable claims under the partnership agreement, too, there is simply no law to suggest when you possess some arbitral claims, you therefore must waive against the rest of the world and those parties that you do not agree to arbitrate with any individual claims you may have against them, and you're only now subject to your arbitrable claims. What relationship does this partnership agreement have with your claim for fraud? If you prevail on your claim for fraud, does that mean that the partnership agreement's a nullity? Well, essentially, we want, yes, we want our money back, or we want the, at a minimum, or if we're able to prove the loss of value, the standard fraud damages are the difference in the value between what it was represented to be and the difference in what they delivered. There was no real venture that was ever going to be able to work out. There was never a valid agreement to flip. There was never a plan to get and roll up together Bulgarian companies that had any ability to do anything. But if this partnership agreement is valid, isn't it enforceable? Doesn't it preclude fraud? Your Honor, I do not believe that there's any way for it to preclude fraud against an individual. If some individual comes to you and says to you, I will do the following for you, if you go sign this agreement with Mr. Cowley. And in your agreement with Mr. Cowley, you agree to waive certain things, such as representations or fraud. But you never agreed to waive any claims against an individual who lied to you when he said he would do certain things for you for contracting with me. You find out it was all a lie, and you sue that individual. You say, well, you agreed with Mr. Cowley to waive certain claims. It doesn't matter. We didn't agree to waive anything against Mr. Manis. And, Your Honor, there simply was no – the theory here is there was nothing to operate by way of a partnership. So the idea of how the monies would be used and how they would be funneled to make this flip happen and then how they would be divided after simply are irrelevant when there was really no deal. It was just – Saying the partnership agreement is a nullity then, essentially. Yes. We're not – Because he made some promises about it and that it can't be delivered. Right. In the claims against Mr. Manis, we're not relying on the failure to perform by the partnership under certain representations or promises or holding them to any of the terms and conditions of the partnership. What we're turning to Mr. Manis instead is you lied about everything. You lied about there even being the possibility to do this deal, and you lied about how we were going to make our money back. Specifically, and more importantly, against Wood. Wood was the guy who brought Marshall and Manis together. Wood was the – and the Lloyds like to rely on it. They characterize him as his mentor. They said he trusted – Marshall trusted Wood because he was his mentor. That's how this deal was able to get done, and that's why we said Manis and Wood conspired together. So Wood was conspiring with a California resident to hook Marshall in. He brought them together, and the way Wood made it happen is he said, Look, you're not going to lose any money, Marshall. Deloitte's run a valuation of this project, of one of the two cable companies that are going to be combined and flipped. And the valuation of that is $48 million, far in excess of what you have to pay, and you're going to get your money back, and Deloitte will guarantee the value of that cable company. And when he said Deloitte, what company did he mean? Well, what he held out in terms of a valuation was something that was – it's in the – Well, what did he mean when he said Deloitte? What company was he referring to? We say Deloitte Touche Tumatou because that's what it said. That's what the valuation said, and the reason it said that is Deloitte Touche Tumatou mandates that he says it. Their policy, their internal policy is he has to use their trademark. He has to hold it out as a one-world, unified partnership and one firm that could deliver all these services, such as valuations of international deals. This was a deal that was going to be Bulgarian company, Vancouver investors, flipping Bulgarian companies to Israeli investors and others. It was an international deal, and the reason that Deloitte can make it happen, the reason Wood can come up with a scheme like this and make it seem like it can happen, is Deloitte Touche Tumatou has those sorts of resources. And Deloitte Touche Tumatou requires the individuals like Wood within its partnerships, within its states, to say that the services that are being provided are Deloitte Touche Tumatou. They require them to use the logo. And Wood brings Marshall to meet Manus. They go to Vancouver, and then they insist, both of them insist, is the allegation that they come down, meet in California, negotiate in California where Manus lives. So they negotiate in June 1996 about a $250,000 investment. There is no question we acknowledge that discussions started in Slovakia where both Wood and Marshall worked. They continued in Israel where Mr. Marshall was introduced to Manus and some others that were integral to this. Then they decided to meet in Vancouver, and Wood and Manus insisted that they come down and negotiate the actual investment, to close the deal. They're going to seal the deal. They didn't come one of those times, but they did come one time. Mr. Wood disputes because of his passport entries and stickers that it happened in June, says he doesn't have a stamp showing he came to the U.S. until July. It's coming. But he does not say he never came to California twice to talk. Counsel, if we were to agree with you on the arbitration point with respect to Mr. Manus, has he waived objections to jurisdiction in California? Yeah, he's a California resident. He is a California resident. Yes. Okay. And that's why we say Mr. Wood purposely availed himself of California. Mr. Wood came here with the Deloitte paperwork backing this up and guaranteeing for Marshall, Deloitte stood behind this $48 million investment. You're not going to lose money. Deloitte borrowed the money. They said, we'll even front you the money, Marshall. Deloitte will go out and borrow the money. You just pay us back. So he's acting on behalf of Deloitte. He's coming here to seal the deal because he's making Marshall comfortable with the California resident who Marshall has to rely on and trust to get him his money back. Because when this thing is flipped, Deloitte doesn't have control of it. That's the deal. The person who has control of it is Manus and his companies. And so Marshall had to trust he's going to get his money back from someone he didn't know. The guy who did know him, Wood, brings him to California to meet him, make him comfortable with it. He seals the deal, and the allegations in both the amended complaint and in the declarations are, by Marshall, he would not have made the investment but for the representations made in California. Counsel, if we were to agree with you again on Mr. Manus, and you've got jurisdiction over Mr. Manus because he's a California resident, can the case go forward without Wood and without the Deloitte companies? A case can go forward. I don't believe they're necessary parties in that sense, so that would have to be dismissed. You're down to six minutes. You may want to turn to Wood and the Deloitte companies here. So Wood purposely avails himself. He brings him to California the first time. They close on a $250,000 investment, and then that's not enough. Suddenly, Marshall's told, the $250,000 that we talked about, that's not enough. It's really not going to make the deal happen. Come back. Talk to Manus. They may need more money. Comes to Vancouver, meets Manus again with Wood, and they convince him, go down, negotiate out, figure out what the final deal's going to be. They come to California, stay in a hotel where Manus walks them around, knowing everybody, sells them, has a big wig down here, who's got a lot of credibility. They negotiate for four days in California and come up with a $300,000 additional investment, $50,000 of which of that is right up front interest payments to Wood for Deloitte's borrowing of the money to front it. Did the money pass hands in California? No. The money passed hands later, but again, this was all internationally. The money was borrowed by Wood and Deloitte, they say, somewhere in Europe. Marshall paid that back to them from his own funds. He's in the United States. But he did wire transfer that to them. He did not pay them. We're not alleging he handed the money in California. But, again, the allegations are he would not have made the investment, the additional $300,000 investment, but for the representations of California, and there is simply no record of any discussions anywhere else in the world about that additional $300,000 investment, but in California. Nevertheless, the district court says it's really irrelevant because there were six years of discussions. There was only two conversations in California. They weren't important enough. There was not six years of discussions for this deal. This investment, the fraud happened when they got all the money they could get out of Marshall, and they moved on. They kept stringing others along, stringing Marshall along for years, pretending like, oh, it's going to happen, it's going to happen, going to happen. Never had a possibility of happening. But the six years was additional lies to cover up the fraud. The fraud happened in a few months. Two conversations in California, a couple of conversations elsewhere in the world. If the district court standard is correct that, well, because other conversations happen anywhere, so no one conversation is important enough for jurisdiction, well, then there's no jurisdiction anywhere because the representations in Slovakia were repeated in Israel and Vancouver and California, so Slovakia wasn't necessary. Same with Israel. Same with Vancouver. Same with California. It can't be that there's no jurisdiction anywhere. The law suggests we could have jurisdiction anywhere they came, purposely avail themselves to commit the fraud. Of course, there still is a possibility of forum nonconvenience in this case, right? Not touched by the court. Still out there. It's still out there, and we'll deal with it as best we can. I've got a lot to deal with based on the court's rulings right now. That's not one of them. And we will try and confront it as best we can when it's raised, if we get back to the district court. The key for the problem with the district court's holding with Wood and all the Deloitte entities is it simply misapplied the standard. Because there was no evidence or hearing, the court had no ability to find facts against the allegations of the complaint and the declarations submitted by Marshall and others. Leighton Flavana, for example, a former Deloitte partner, said that Deloitte Central Europe managed day-to-day office decisions, like hiring, firing of staff and professionals, cost expenditures, oversaw financials, managed day-to-day operations of Deloitte Slovakia. Nevertheless, the court said, we do not submit evidence because they accepted Deloitte's view, which is they recognize all this very intricate hierarchical structure of separate individual country partnerships, and they didn't have authority to do things back and forth. That is not what Leighton Flavana said. He said that, and Leighton Flavana and others admitted that, excuse me, Leighton Flavana and Marshall testified in their declarations that a CEO of Deloitte Central Europe held Wood out as being a member of its management team. Again, the court went ahead and found there was no representations by those entities on which Marshall relied. The court simply rejected the facts alleged, which is 180 degrees different than the standard. It had to accept and find inferences in favor of the plaintiff, from those reasonable inferences in favor of the plaintiff. It simply had no ability to reject the allegations and instead adopt different ones, but it did. And that ties up the problems with both the allegation that Wood did not purposely avail himself of California is defeated by the representations by Marshall that Wood insisted that he come here, that they negotiated, they closed on the first agreement, and the only place they negotiated, the second $300,000 was here, according to the record, as it stands right now. It is reasonable for the reasonableness decision factor. Mr. Kelly, I don't know if you wanted to reserve any time. You have one minute and 13 seconds left of your total time. I do. I apologize, Your Honor, for going over. Good morning, Your Honor. Michael Dell for Deloitte Slovakia, Deloitte Central Europe, and DTT. I will take the first 10 minutes, then Ms. Jameson from Mr. Wood will take five minutes. Mr. Wexel will then take the remaining five minutes. Your Honor, the plaintiffs don't claim that my clients did anything in California. They argue as a basis for jurisdiction against my clients that Mr. Wood was their agent and that he did something in California. In fact, Your Honor, there's no basis for that. The district court correctly found that Mr. Wood's two alleged contacts with California are so minimal and attenuated that they fail to constitute minimum contacts sufficient to invoke personal jurisdiction. Well, there's a problem. And I may say it's a problem in your brief. You do challenge the allegations. You do challenge the declarations. And there was no evidentiary hearing. And I believe under the usual rules you have to accept as fact what was declared under oath by the plaintiffs. So I hope you will realize there's a statement there, several statements, that Wood was the managing partner with Deloitte Slovakia, et cetera. Your Honor, in fact, we believe we do challenge in our brief, you're absolutely right, some of what was said as being incredible. But do you have any basis for doing that? But, Your Honor, our argument is not based on that. Our argument is taking as... You withdraw that challenge? Well, for example, we really directed that challenge, Your Honor, at one thing, which is Mr. Marshall submitted a complaint, and then he submitted three declarations. In the third of the declarations, for the first time, he said Mr. Wood asked him to come to California. That was what we were challenging, Your Honor. But can you deny it without an evidentiary hearing? Well, Your Honor, we think that was incredible, but that's not a basis. Your brief is honeycombed with doubt about the facts, which have to be accepted. Your Honor, we accept... Without an evidentiary hearing. And we agree that the facts must be accepted, Your Honor. All right. Without an evidentiary hearing. The facts, as stated in declarations, as Your Honor pointed out, Mr. Marshall did not, in fact, state in his declaration everything that he says in his brief. You have several declarations as to the extent to which Wood was in charge and able to commit Deloitte Slovakia. Well, I think, actually, Your Honor, I think that, and again, you raised a question about this to Mr. Cowley, and I think the question was did he make clear what Deloitte entity he was talking about? And if you look, for example, at his first declaration, at ER 123, what he says is he talks about some representations in paragraph 9, and then he says when Wood made these representations to me in California, he didn't distinguish among Deloitte touche tomates and any other Deloitte entity, such as Deloitte Slovakia, and he mentions a number of other Deloitte entities. So, in fact, he doesn't come out and clearly say, Your Honor, that a representation was made with respect to Deloitte Slovakia. But, Your Honor... Excuse me, counsel. Would you start the clock? Thank you. But, Your Honor, even if, if I might say, even if, there are a few essential points of our argument, which are this. First of all, what Mr. Wood is alleged to have done in California was not sufficient, that all that he was alleged to have done was to have two meetings where he repeated, according to the plaintiffs, he repeated what he had previously said elsewhere. According to the plaintiffs, he acted as an advisor to Mr. Marshall there, and according to the plaintiffs, he told Mr. Marshall that Deloitte Slovakia was representing not Mr. Marshall, but GCS, and that, in fact, it was acting for GCS in connection with this transaction. And, Your Honor, that, the first, I guess the first point of our argument is, that is totally insufficient in the case where everything else happened in Europe, that if you look, that Mr. Marshall first spoke to Mr. Wood about this when they were in Slovakia. That's, that's in the record at, at page 293. At the argument on the motion to dismiss, the plaintiffs' counsel admitted, agreed with the judge, that the entire venture was to be carried out in Europe. That's it. Well, yeah, the counsel, counsel, the question, though, under our, under our jurisprudence, is not whether California represents the site of maximum contacts, but whether there are minimum contacts sufficient to comport with notions of due process and fair play. That's right. And, and even on this point. I mean, there's no question that, that the majority of the contacts take place in Europe. The question is whether there were sufficient contacts in California for the exercise of jurisdiction here. Well, everything, Your Honor, basically everything occurs in Europe other than these two meetings. And even as to these meetings, the Marshall is unclear in his declarations and confused as to what exactly the purpose of these meetings were. For example, in his, in his third, in his third declaration. Just a moment. I, I look at Du Bois' answer to the plaintiffs' interrogatories, where it says Wood had authority to act on its behalf, and also said that if his services were sufficiently important for Du Bois, that Du Bois would have performed them himself if Wood had not done so. Now, that's what we have to look at. He's here in California with authority to bind Deloitte, Slovakia. If I might say, Your Honor, the fact that he was a managing, a partner of Deloitte, Slovakia, does not mean that he was here in California, with all respect. In every respect that he might act here in California, he had the power to bind them. He specifically, he alleges in his complaint, and he also says in his declarations, Your Honor, that he was told that Deloitte, Slovakia was acting for the other side of the transaction, GCS, and not acting, and therefore could not possibly have been acting for him. So, for example, he says in his first amended complaint, in paragraph 22, paragraph 30, which is at ER 30, Wood told Marshall that GCS was a client of Deloitte. He then goes on to say in paragraph 33, Wood further represented to Marshall that GCS had hired Deloitte to perform various tasks in connection with the Bulgarian venture. So, Your Honor, I don't, I accept that if he was acting on behalf of Deloitte, Slovakia, but here he was not. Well, you know, we've got a problem in, without an evidentiary hearing. We have the declaration of Leighton Cavanaugh, in which he states, all professionals working in the Deloitte and Slovakia office had to file annual disclosures to the management committee of Leighton Cavanaugh's office of all business relationships and sources of income, including income from a client or a party related to a client. Yes. So if Wood was on some venture of his own, it was contrary to the way that office was organized. Well, I don't believe that one can create an inference from what Mr. Wood said in that certain statement that, therefore, Mr. Wood must have been acting for Deloitte, Slovakia, when he went to California. In fact, it's, in fact, I don't see anything in that statement that suggests that. Whether or not someone files a declaration or not doesn't mean that he was acting there. Whereas, in contrast, you have the plaintiff himself here saying that Mr. Wood was acting as his advisor on the one hand. That's in his declarations. And on the other hand, you have him saying that Deloitte, Slovakia, was acting for the other side, for GCS. So, Your Honor, there are certain things that might have been clarified with an evidentiary hearing, but I don't believe there was any basis taking all their affidavits as true for saying either that Mr. Wood acted sufficiently here, that he had minimum contacts here sufficiently, even on his own, and, secondly, that whatever contacts he had here could be attributed to Deloitte, Slovakia. You run through the Deloitte entities in your brief at page 14 and say that none of them ever authorized the others to act as its agent. Right. And then we look at the declaration that Deloitte and Toosh, USA, paid Wood and was then reimbursed by Deloitte, Slovakia, through Deloitte and Eastern Venture to Eastern European. Yes. It wasn't when the USA formed your company and paid Wood, wasn't it acting as an agent? No. What was it doing? Your Honor, acting as an agent for whom? The fact that Deloitte … Well, when it pays Wood for its services to Deloitte, Slovakia, isn't it acting as an agent? And then got reimbursed because Mr. Wood happened to be an American and who was working in Europe, and, therefore, again … It was reimbursed. At the point of paying, who's it acting for? If it's paying and then getting reimbursed, it's simply doing – it appears to me it's simply doing that as a convenience for someone who's an American. Agents are often conveniences. Right. But this … But acting as an agent. It's not doing it for nothing. Your Honor, I don't see how – it's doing a convenience for someone. That does not mean that he is an agent for anyone in connection with his meeting with Mr. Maness. No, but you made that very broad statement. They never acted – I think it's quite deceptive that they never acted as agents for each other. They did. Well … You ought to recognize that. Thank you, Your Honor. I don't believe that that issue relates to whether or not there's jurisdiction over any of the Deloitte entities here or whether … Well, then we have the declaration in one of them that these entities were set up to confuse the plaintiffs. Now, we have to take that as a fact. Well, Your Honor, even if one takes that as a fact, that, again, is not a basis for jurisdiction here. That would – to me, that would be a truly incredible fact, the notion that Deloitte & Touche, which, as Your Honor knows, is a large auditing and accounting firm, setting up its operations in order to try to confuse Mr. Marshall. Not Mr. Marshall, but when I find one company in Cyprus, another in Belgium … Right. It's really a very strange mix of companies. That is how corporate America and corporate Europe and corporate other places act. They act with different entities, many subsidiaries, many affiliates or related entities. But that is how it works. I don't believe that that in any way, Your Honor, affects or provides a basis for jurisdiction here, whatever questions one might have about it. As to Deloitte & Touche, for example, there's no basis whatsoever given for jurisdiction here. No one alleges anything that Deloitte & Touche did here or provides a basis for saying that Mr. Wood was acting as its agent. For DT Central Europe, it didn't even – it couldn't possibly have been involved. And so one comes down to simply Deloitte & Slovakia. And, Your Honor, again, on Deloitte & Slovakia, it's a very simple argument, which is whatever Mr. Wood did here was not sufficient. Even if one thought it was sufficient as a basis for jurisdiction, even if you thought it met the minimum contact standard, he wasn't acting for Deloitte & Slovakia. And there's not a basis in the declarations that were put in to say that he was acting for Deloitte & Slovakia, so that they didn't purposely avail themselves. And so, Your Honor, in sum, there's no basis within what's here, within what's in the record, that was put in by the plaintiffs for jurisdiction over any of my clients. Unless the Court has further questions, I'll hand over to one of you. Thank you, Mr. Dell. Good morning, Your Honors. One of the things I would like to address is the question whether his alleged two visits to California. Raise your voice a little bit. Yes. Whether his alleged two visits to California, taken as true, as set forth in Mr. Marshall's third declaration on this subject, establish the minimum contacts that are needed. Well, I think, Your Honor, first address, he waived jurisdiction of the peers. I think you ought to deal with that. I'm happy to address that issue, Your Honors. This is a case in which a complaint was delivered to an individual on a different continent than my client. My client, having heard that documents had been delivered to a different individual on a different continent, contacted the counsel for plaintiffs and said, that is not service. If that's a new complaint in this action, that's not service. But why did you file a 12b-5? The plaintiffs, the reason that Mr. Wood did not file a 12b-5 is that he had never received. No, I think he did file a 12b-5 in April of 2003. Excuse me, Your Honors. I thought your question was why he did not at the time he filed his challenge to serve. I want to know why he filed a 12b-5 if he thought that he hadn't been properly, that he had never received a complaint. Mr. Wood was threatened, and this is in the records, Your Honors, with a default judgment against him if he did not appear and contest the service in seven days' time. At that time, Your Honors, plaintiffs' counsel were aware of where Mr. Wood was. They had previously FedExed earlier papers in the litigation to him in Bratislava, Slovakia. He was a managing partner at that time, was he not? At the time the service occurred? Yes. My recollection of the facts, and I'm not sure if this is in the record or not, I believe that at the time service was purportedly, there was no proof of service. There was a FedEx of documents to him at his office address in Bratislava, Slovakia, and my recollection of the facts is at that time he was still the resident office managing partner in Slovakia. That's spring of 2003. So he gets served with a complaint at his regular place of business. No, he was not served with a complaint, Your Honor. A federal express delivery. He gets a copy of it. Yes, he got a copy of an initial pleading in the action. Oh, he got a copy of what? Of the initial pleading in the action. The original complaint. That's correct. And that's the case to begin with. And he objects to the service. Why doesn't he object to the jurisdiction? He did not object to that service. That wasn't even purported service, Your Honor. There was no proof of service filed. No one was pretending that federally expressing a document to someone's business address on another continent was service. There was no proof of service with respect to that federal express mailing. Then why did you treat it as though it were? Because you filed a 12b-5 motion in April of 2003. We did not treat it as a service, the federal express delivery to Bratislava. There was no even contention that that was service. Later in the action, after plaintiff's counsel was advised that we in California had no authority to accept service for Mr. Wood, after that original FedEx delivery, plaintiffs caused a new pleading to be delivered to Mr. Wood's ex-wife in North Carolina. At the time that new pleading was delivered to North Carolina, plaintiff's counsel knew where Mr. Wood was. They knew he was in Bratislava, Slovakia. They knew he lived there. They knew he was married there and had children there. They knew that he had California counsel. And they knew that he was insisting on being served properly under the Hague. Despite that, instead of initiating service against him under the Hague or trying to serve him properly, they delivered a new pleading to his ex-wife at his old address where he had not lived for years. And I would like to point something out, Your Honors. The complaint in this action doesn't even allege that he's a resident of North Carolina. The complaint that they filed in this action. Okay. Counsel, let me try a little different tactic. I don't feel like I've gotten an answer to my question. But let me try a different question. Yes. At what point did Mr. Wood properly receive service? He properly received service either on the day of or within a day or two of the hearing on his motion. The hearing was July 18th, so I believe that the service was the 16th. Is that right? Your Honor, I apologize that I don't have the date in mind. I do have a document. Even assuming that that was the appropriate date on which he was properly served under the Hague Convention, by what time then did he have to file any responsive motions under Rule 12? His response to the complaints served upon him under the federal rules was due within the timeframe for responding to a complaint. Which is 20 days. And I believe that there was, and I'm sorry that I do not have the record site, but there was a joint series of motions to be heard jointly before Judge White by all the defendants regarding their jurisdictional and forum non-motions. I believe the Deloitte defendants had been served somewhat earlier than Mr. Wood, who was served after the Deloitte defendants through the Hague Convention. But to respond to your original question, Your Honor, there was no 12b-5 motion brought with respect to the delivery in Bratislava because there was no contention that that was service. The contention was that delivering a new pleading to his ex-wife in North Carolina constituted service. Under governing law, that isn't colorable service. But the real question is, was the complaint available to him? And as far as I could see, you don't deny that he did know what the complaint was and therefore could have objected to the jurisdiction and didn't do so. Mr. Wood did not know what the new complaint said. It was not delivered. He got it in Bratislava yet?  He received an original pleading in Bratislava. But that began the case. He could have objected to that. It did not begin the case against Mr. Wood. Mr. Wood, there was no proof of service. Well, of course, until the actual service, you can say the case. But the complaint is where the plaintiff started. He knew what they were saying. He could have said, well, you don't have any jurisdiction over me. He did have actual notice of what the original pleading was. What they were saying, right. They did not even contend was properly served on him. They didn't file a purchase service. And there was no understanding on his part that there would ever be a contention that that pleading was going to be operative in any action. What the federal rules give you is the choice. You make all your objections, objection to service, objection to jurisdiction. The federal rules command us not to omit from an initial response of pleading an objection to jurisdiction. Mr. Wood noted in his original motion that he did not want to waive any arguments based upon jurisdiction, but that he had not seen. Those don't provide for that kind of proviso. Otherwise, you could always evade the rule and keep postponing your objections and doing it piecemeal. I agree with Your Honor that the rules want to promote the efficiency of process and a lack of duplicative motions. It would be an odd rule, though, that says that a defendant who has not been served with process nor received physical delivery of the operative pleading had to bring his motion before defendants who were served with process. You have an odd interpretation that if you're objecting to service of process, you don't have to object to anything else because you really haven't been served. There is a procedural oddity here, Your Honors, which is that the federal rules command defendants to bring a cluster of motions to dismiss, dispositive motions, at the beginning of the case and to do it together. What those rules contemplate is that if they prevail, the action will be dismissed. They don't want to see successive motions to dismiss. We can't bring something called a motion to quash under a different rule. We need to bring a motion to dismiss. And yet, oddly, or maybe not so oddly, those rules have been interpreted through judicial gloss as allowing the district court to quash the service rather than dismiss the action. Now, if pursuant to the motion to dismiss, which we needed to bring to challenge service, we couldn't simply say quash the complaint under a different rule. Judge White had dismissed the action. If the action was then refiled and served on my client, his first appearance in the action would have been a personal jurisdiction objection. Judge White elected through a series of cases that begin in the Second Circuit, but I don't believe I've ever been blessed by this circuit, to say, you've brought a motion to dismiss. Plaintiff is no longer even contending that that service was colorable or that he received the complaint, but I'm not going to grant your motion to dismiss even though it's valid. Instead, I'm going to quash the service and keep the action alive. Plaintiffs want to seize upon that fact to say, well, the action wasn't dismissed, as you asked. It was quashed. It stayed alive. And now your motion on the jurisdictional point is a second appearance in the case, and you've waived it. And my suggestion, Your Honors, is that if a defendant can be hailed from a distant country to appear in an action and to have waived a personal jurisdiction argument where he has never received physical delivery of the complaint, that would be an extraordinary interpretation of the procedural rules and, I would amended complaint to Mr. Wood or his counsel. There was a delivery to someone else on a different continent, and there's no contention that there was any simultaneous mailing to him or to his counsel in this case. Plaintiffs withdrew their contention that there was proper service once they got to the hearing on the matter. The case could have, and I would submit should have, been dismissed at that point, but the court, relying on precedent, said I'm going to quash instead. Should our motion then be regarded as a second appearance rather than a first appearance due to that procedural oddity? Your Honor, I note that I'm out of time, but I did want to address the minimal contacts issue. Counsel, you're way over your total time now for all counsel. You may want to give some time to co-counsel here. Thank you, Your Honors. May it please the Court. Good morning. My name is Jim Weixler, and I rise today on behalf of Consolidated Global Cable Systems and George Manis, its president. In response to a question by the court, counsel for plaintiffs had stated that they consider the partnership a nullity because of what they allege to be a fraud in the inducement of that partnership and the conduct of the business between the parties up to that point. It's a very important case that is explored in our briefs quite extensively. In 1967, the U.S. Supreme Court decided in the prima paint decision that such allegations and such disputes are subject to arbitration, if indeed there is an arbitration clause between the parties, as we have here. The arbitration clause that we have at issue here is much broader than plaintiffs have suggested. It does not just have to do with the operations of the partnership. The exact phrase is with respect to the conduct of partnership business. That is an extremely broad scope that covers not only things that arise out of that partnership agreement, but also the conduct of any business having to do with the partnership. In this case, the partnership was formed for the purpose of fostering a joint venture in the Bulgarian cable television systems market. Indeed, that's what the negotiations and the dealings of the parties up until that point and continuing on after the execution of the agreement in August 1996 were involved with. Numerous decisions, both from this court, most notably Republic of Nicaragua, Simula v. Autoliv, and also other ones from this court and from the U.S. Supreme Court, have said that in such cases where you have such a broad arbitration clause, that the matter must be submitted to arbitration. And nowhere is that concern, is that policy more heavily relied upon and more heavily given weight than in the area of international commercial arbitration, which without doubt this is one. And can the arbitrator decide this issue of fraud that the plaintiffs have made against Mr. Maines? That, Your Honor, is exactly what Prima Paine says. That's exactly what Zink v. Merrill Lynch from the Tenth Circuit in 1993 says. And, in fact, Your Honors, that is what the law chosen by the parties in that partnership agreement, the Province of British Columbia, that is what their law says as well. Under British Columbia law, the question of jurisdiction of the arbitrator is first submitted to the arbitrator, the party disagreeing with that determination can make an appeal to the trial courts of the province, and then from that the decision is final. So there is a forum, there is a choice of law, there is a system under which these disputes and all these questions of fraud and alleged fraud can be arbitrated, and that is in the arbitration system that was provided for by the parties and that is set up in British Columbia. And since we are much farther out of time, unless the courts members have any questions, I would be pleased to see the remainder of this. Thank you very much. Okay. Mr. Calley, you're nearly out of time, but we will allow you for a minute or so for rebuttal here. Your Honors, let me then focus on the one issue that seems to, I think, have gotten very confused, and that's the procedural history of this case as to the waiver argument. I appreciate that you have the issues, and I'm not going to address the case law, but I do want to address the timing because I think there's been a misstatement that Mr. Wood had the complaint, the original complaint, in hand in January of 2003. He refused to waive service. He knew all facts to support a procedural challenge that there's no jurisdiction over him personally in January 2003. There was nothing he wasn't aware of as of that date to support their motion. We then went forward. We knew he was a resident of the United States, also based on representations to Mr. Marshall. We believed he told Mr. Marshall that he told him he had a house in Florida or somewhere else. We did a search. We came up with a valid North Carolina driver's license, so we thought maybe it was North Carolina. We looked into it. Someone called his wife. His wife said she had the power of attorney for him, his ex-wife. She represented that to the process service. She had a power of attorney, so we served it. They challenged it. They showed us. We went back and forth. When they finally showed us the information and they said they didn't have a power of attorney, we backed off that. But they wanted to dismiss it. We said it's not dismissible. We did initiate service under the Hague. They would not tell us where he was, but we served on his former location under the Hague. And the court said it's not dismissible. They have more time to serve it. The court did not find that there was a valid motion to dismiss. We were not out of time to serve, and we were already on the verge of effecting service under the Hague as of the hearing. But before the hearing, in July, on July 18, in May, Mr. Woods' counsel represented. They never got the amended complaint. We found that shocking. Since they filed the 12b-5 motion, they went to the person who received it. Was the motion filed in April 2003 styled as a 12b-5 motion? Yes. They challenged for it. I mean, did they use the words Federal Rules of Civil Procedure 12b-5? Your Honor, that's how I'm – now that you ask me that specifically, you make it sound like there's a question. In my mind, there was no question this morning, but I can't tell you I looked at that last night for that reason. So I want to be a little bit hesitant. But that's how we've always understood it. It was a 12b-5 motion saying service on the former wife was inadequate. But they went to her, got her to explain all about the service, and didn't take the amended complaint, they said. So we gave it to them in May. In May of 2003, we gave counsel the amended complaint. They still filed papers as early – as late, excuse me, as of July 3rd, I believe, the beginning – somewhere in the first week of July. They filed supplemental reply papers in support of their motion to dismiss for inadequate service. They never filed jurisdiction. All right. For purposes of the rules of civil procedure, obviously this is procedurally a very complex case because it's crossing these jurisdictional boundaries. What is the triggering event for the obligation to file an answer or to file any motions under Rule 12b? When does that 20-day period start under Rule 12? What has to trigger it? Under the federal rules, service. We represented, we filed a piece of service. And at what point is – are you convinced that you had properly served Mr. Wood? In hindsight, under the Hague, in – I believe – and I can't give you the specific date, but it was in July. Okay. One or two days before. But the rule for waiver is when they file the Rule 12 motion. The rule for waiver is not timing. If we count from July, was their motion for – to dismiss under Rule 12, including the 12b-2, timely filed? I would have to answer it this way. I believe we agreed on a briefing schedule, and I believe they complied with it. I cannot tell you that it was within 20 days of actual service under the Hague. Okay. But you – but whatever it was, they complied with the schedule to which you agreed. That is – that is definitely true. We never argued that they were out of time when they purported to join. The problem with the rule is you are – you waive when you file any Rule 12 motion, but not all grounds. It's not a timing issue. Thank you, Your Honor. Thank you, Counsel.
judges: Noonan, Siler, Bybee